IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRANDI BOOKER : CIVIL ACTION
*ADMINISTRATOR, ESTATE OF ELAINE* :
*BOOKER* : No. 15-5070
:
v. :
:
UNITED STATES OF AMERICA :

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                                             **July 19, 2018**

In November 2008, following a routine employee tuberculosis screening, Greater Philadelphia Health Action (GPHA) employee Elaine Booker (Ms. Booker) was prescribed a drug to treat latent tuberculosis, which ultimately led to her acute liver failure and death. In this Federal Tort Claims Act (FTCA) action, Ms. Booker's daughter, Brandi Booker, in her capacity as administratrix of her mother's estate,[1] asserts negligence claims against the United States predicated upon the conduct of GPHA and two GPHA physicians, Dr. Monica Mallory-Whitmore and Dr. Heather Ruddock.[2]

---

[1] Plaintiff also purports to seek survival damages on behalf of the beneficiaries of Ms. Booker's estate in their individual capacities. The Government contends that because these parties were not named in the Complaint's initial caption, these damages are not recoverable. As this Court finds no liability, it need not decide whether the beneficiaries are appropriate parties to the action.

[2] Although Plaintiff initially sued Dr. Mallory-Whitmore, Dr. Ruddock, and GPHA in state court, GPHA removed the action to federal court after the Department of Health and Human Services determined that the Defendants were entitled to FTCA coverage for the allegations against them, such that a suit against the United States was the exclusive remedy for Plaintiff's malpractice claims. The United States moved to remand the case, over the opposition of all parties, including Plaintiff, and this Court ultimately denied the motion, agreeing with GPHA that it and the two other named Defendants were entitled to FTCA coverage. *See Estate of Elaine Booker v. Greater Phila. Health Action, Inc.*, No. 13-1099, Mem. & Order (E.D. Pa. Mar. 31, 2014), ECF Nos. 28 & 29. Following a period of discovery, the Government filed a motion for summary judgment, arguing this Court lacked subject matter jurisdiction because Plaintiff failed to exhaust

Following a bench trial, and for the reasons discussed herein, the Court concludes Plaintiff failed to show by a preponderance of the evidence that Dr. Mallory-Whitmore owed a duty of care to Ms. Booker or that Dr. Ruddock breached her duty of care to Ms. Booker. The Court further finds that GPHA's Employee Health Program was not defectively designed, and GPHA was not negligent in its supervision or monitoring of its health care providers. Pursuant to Federal Rule of Procedure 52(a), the Court issues the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. The Plaintiff in this FTCA action is Brandi Booker, in her capacity as administratrix of the estate of Ms. Booker.

2. The Defendant is the United States of America.

3. Ms. Booker was employed by GPHA as an administrative assistant and customer service representative, from 2001 until her death on April 25, 2009. At all times relevant to this case, Ms. Booker was employed at GPHA's Woodland Avenue facility in Philadelphia.

---

administrative remedies before initiating suit against the Government and could no longer do so consistent with the applicable statute of limitations. The Court heard argument on the Government's motion at the final pretrial conference, held just prior to trial, and advised the parties it was inclined to dismiss the action for lack of subject matter jurisdiction based on Plaintiff's failure to exhaust, but to permit Plaintiff to return to federal court after filing and receiving a denial of a new administrative claim. *See Booker v. United States*, No. 13-1099, Mem. & Order (E.D. Pa. June 24, 2015), ECF Nos. 58 & 59. Because both parties were prepared to proceed to trial immediately following the pretrial conference, for the convenience of the witnesses, and with the agreement of the parties, the Court proceeded to hear the evidence regarding Plaintiff's malpractice claims on the understanding that the parties would stipulate that the evidence would become part of the record in the federal case to be filed after exhaustion of administrative remedies, with both parties reserving all defenses and appellate rights. The contemplated stipulation was later entered on the docket in the above-captioned action, which was filed after Plaintiff's new administrative claim was denied. *See Booker v. United States*, No. 15-5070, Stipulation (E.D. Pa. Oct. 8, 2015), ECF No. 6.

4. GPHA is a Pennsylvania non-profit, tax-exempt corporation that provides healthcare services to residents of Philadelphia County and the surrounding areas. As a designated "community health center," GPHA receives federal grant funds under Section 330 of the Public Health Service Act, 42 U.S.C. § 254b. GPHA also provides certain limited medical services to its employees through its Employee Health Program (EHP) within the context of its federally-funded scope. The services provided generally relate to the three primary objectives of the EHP: ensuring Hepatitis B vaccination, annual flu vaccination, and biannual tuberculosis screening for GPHA's employees.

5. Dr. Heather Ruddock is a licensed practicing physician who was previously employed by GPHA at its Woodland Avenue facility in Philadelphia. At all times relevant to this case, Dr. Ruddock was the Clinical Director of the Woodland Avenue facility and one of two general pediatricians at that site. Dr. Ruddock was also the facility's Employee Health Officer. As the Employee Health Officer, Dr. Ruddock administered the EHP, including overseeing the biannual employee tuberculosis screenings.

6. Dr. Monica Mallory-Whitmore is another licensed practicing physician who was employed by GPHA at its Woodland Avenue facility during the relevant time period.

7. Dr. Janet Elizabeth Young has been GPHA's Chief Medical Officer/Director since 1987, and was responsible for drafting the EHP. Under GPHA's supervisory structure, the Clinical Director at each location is supervised by the Associate Medical Director, who reports to the Chief Medical Officer/Director. In this case, Dr. Ruddock, the Clinical Director of the Woodland Avenue facility, reported to Brenda Rogers, the Associate Medical Director. Dr. Rogers reported directly to Dr. Young.

8. The EHP required all GPHA employees to participate in a routine tuberculosis screening twice a year. This requirement was designed to prevent the transmission of infectious diseases between staff and patients. Each screening was accomplished through the use of a purified protein derivative skin test (PPD), which is the standard of care for tuberculosis screening. A positive PPD indicates that the employee has been exposed to the bacteria causing tuberculosis. Any employee with a positive PPD must then have a chest x-ray performed to ensure there is no active tuberculosis infection. If the PPD is positive and the chest x-ray is negative for active infection, the employee is diagnosed with latent tuberculosis. The EHP manual does not require a specific course of action when an employee is diagnosed with latent tuberculosis, but rather allows the medical provider to use his or her professional judgment in making treatment decisions.

9. Although the EHP manual does not require a specific treatment, it is undisputed that the standard of care for latent tuberculosis is a nine-month course of the antibiotic Isoniazid (INH). Taking INH can be dangerous for a person with preexisting liver disease, or for a healthy person if the person's liver function is not properly monitored throughout the course of the drug. Prior to taking INH, a person with latent tuberculosis should discuss the drug within the context of the entirety of his or her health history and current medications with either his or her primary care physician or a different consulting physician.

10. As Dr. Young explained, the EHP manual is intentionally broad regarding some aspects of screening and treatment because it is generally administered by trained, licensed physicians and intended to meet only a few discrete goals. As noted, the EHP does not specify what course of action a physician must take after diagnosing an employee with

latent tuberculosis, instead leaving it to the discretion of the medical provider in the exercise of his or her professional judgment. According to Dr. Young, an EHP physician is in compliance with EHP policy if he or she refers an employee to an outside provider to be monitored while taking INH. The EHP does not have a policy in place for tracking employees taking INH after a physician prescribes it.

11. In the fall of 2008, Ms. Booker received a PPD as part of a routine employee tuberculosis screening. Ms. Booker's PPD was positive, indicating that she had been exposed to the bacteria causing tuberculosis. After informing Ms. Booker of her results, Dr. Ruddock ordered a chest x-ray, which was negative for active tuberculosis. Dr. Ruddock reviewed the results of the chest x-ray and then personally met with Ms. Booker, at which time she wrote Ms. Booker a prescription with sufficient refills for a nine-month course of INH. Dr. Ruddock wrote the INH prescription so as to allow Ms. Booker to fill it at the GPHA on-site pharmacy, at lower cost and greater convenience than at an offsite pharmacy. During her meeting with Ms. Booker, Dr. Ruddock discussed with Ms. Booker the possibility of liver damage when taking INH. Dr. Ruddock directed Ms. Booker to see her primary care physician to discuss the results of the positive PPD and negative chest x-ray, the proposed treatment plan, and the INH prescription before beginning the medication, which Ms. Booker assured Dr. Ruddock she would do. Dr. Ruddock testified that she always discusses the potential impact of INH on the liver with every patient to whom she prescribes the drug, and Dr. Ruddock further remembered with specificity that Ms. Booker was uneasy about taking the medication after learning of its potential for liver damage. Although Dr. Ruddock did not document in her note from the visit that she instructed Ms. Booker to see her primary care physician with regard to the INH

prescription, Dr. Ruddock credibly testified as to her interactions with Ms. Booker in connection with her tuberculosis screening, including this instruction.

12. Ms. Booker never returned to consult with Dr. Ruddock after this conversation, and Dr. Ruddock had no further contact with Ms. Booker.

13. Although Dr. Ruddock testified that she wrote Ms. Booker's INH prescription, the label on Ms. Booker's bottle of INH pills bears Dr. Mallory-Whitmore's name as the prescribing physician. Dr. Mallory-Whitmore testified, however, that she never saw Ms. Booker in connection with her tuberculosis screening, and never wrote, nor was she ever asked to write, a prescription for INH for Ms. Booker. While on November 25, 2008, Dr. Mallory-Whitmore did see Ms. Booker for a dental problem and prescribed her Amoxicillin, she was not aware that Ms. Booker was ever prescribed INH. The Court finds Dr. Mallory-Whitmore's testimony regarding the foregoing as credible in all respects.

14. Although both Dr. Ruddock and Dr. Mallory-Whitmore saw Ms. Booker in some capacity at GPHA, neither was Ms. Booker's primary care physician at any time. Rather, Plaintiff testified Dr. Luigi Cianci was Ms. Booker's primary care physician during the relevant period of time from the fall of 2008 until her death on April 25, 2009. Dr. Cianci's file for Ms. Booker contains her November 8, 2008, chest x-ray report bearing his notation "Positive PPD," and the x-ray is marked as having been received in Dr. Cianci's office on November 9, 2008.[3] While the record suggests Dr. Cianci was informed of Ms. Booker's positive PPD shortly after her diagnosis, it is unclear whether Dr. Cianci was aware Ms. Booker was taking INH.

---

[3] The file also contains documentation that the x-ray was received in Dr. Cianci's office a second time, on February 27, 2009.

15. In late February 2009, Ms. Booker experienced flu-like symptoms, and on February 23, 2009, she went to see Dr. Cianci. Dr. Cianci's progress note from that visit includes the notation "+ PPD," but it is not clear whether INH was discussed. Ms. Booker took time off from work from February 23, 2009, to February 26, 2009, as a result of these symptoms.

16. On April 16, 2009, Ms. Booker experienced fatigue, rectal bleeding, jaundice, vomiting, and loss of appetite, and again went to see Dr. Cianci. Dr. Cianci immediately directed Ms. Booker to go to the Emergency Room at Mercy Fitzgerald Hospital, where she was hospitalized and diagnosed with INH-induced liver toxicity. On April 20, 2009, once Ms. Booker had been stabilized, she was transferred to Thomas Jefferson University Hospital to be evaluated for a possible liver transplant. On April 25, 2009, Ms. Booker died of acute liver failure due to INH toxicity. She was 61 years old at the time of her death.

17. At trial, the parties presented competing expert testimony regarding the applicable standard of care. Plaintiff presented the expert testimony of Dr. Jennifer Patterson, a board certified infectious disease specialist. The Government presented the expert testimony of Dr. James Hamilton, a board certified physician in gastroenterology and hepatology.

18. Both Dr. Patterson and Dr. Hamilton agreed that a nine-month course of INH is the standard of care for the treatment of latent tuberculosis. Although a drug may be contraindicated for a patient if the risks of taking the drug outweigh the benefit the drug would confer on the patient, both experts agreed INH was not contraindicated for Ms. Booker at the time Dr. Ruddock prescribed it for her, even in the absence of a physical exam or medical or social history. While Dr. Patterson testified that before prescribing

INH, a physician should take a medical and social history, she conceded that this practice is a recommendation. Because it is undisputed that INH was not contraindicated for Ms. Booker, the failure to take a medical or social history prior to prescribing INH was, nevertheless, not a cause of her death.

19. Dr. Patterson and Dr. Hamilton also agreed that when an individual over 35 years of age is taking INH, the standard of care requires either a specialist or the patient's primary care physician to monitor the patient's liver enzymes on a monthly basis. Dr. Patterson's testimony that Dr. Ruddock breached the standard of care in prescribing INH to Ms. Booker was centered on the fact that Dr. Ruddock prescribed the drug without a plan for follow-up. However, this opinion was based upon the fact that there was no documentation in the chart that Dr. Ruddock had instructed Ms. Booker to consult with her primary care physician prior to taking INH. Although the experts disagree on whether an instruction to consult with one's primary care physician constitutes a referral, requiring formal documentation in the patient record, the Court accepts and credits Dr. Hamilton's testimony that this type of instruction does not require formal documentation in the patient chart. According to Dr. Hamilton, it more typically occurs that a primary care physician refers a patient to see a specialist than vice versa. In those instances, a written referral is made and usually added to the patient chart. However, when a patient is instructed to see his or her primary care physician, no such written referral is necessary, because the patient is already familiar with his or her primary care physician.

**DISCUSSION**

Plaintiff, as administratrix of her mother's estate, seeks damages for her mother's wrongful death. Specifically, she asserts Dr. Ruddock and Dr. Mallory-Whitmore breached the duty of care owed to Ms. Booker by failing to take a health history or conduct a physical examination prior to prescribing INH, and by failing to monitor Ms. Booker's liver function after prescribing INH. Plaintiff also asserts GPHA was negligent in defectively designing the EHP and in failing to supervise or monitor Dr. Ruddock and Dr. Mallory-Whitmore.

Pursuant to this Court's March 31, 2014, decision, this is an action under the FTCA against the United States of America, as sole Defendant. The FTCA operates as a partial waiver of the federal government's sovereign immunity for claims against the Government for money damages caused by "the negligent or wrongful act or omission of any employee of the Government while acting within the scope" of his or her employment. *See* 28 U.S.C. § 1346(b)(1). In an FTCA action, the Government is liable to the extent that a similarly situated private person would be liable, "in accordance with the law of the place where the act or omission occurred." *Id*. The relevant acts and omissions in this case occurred in Philadelphia, Pennsylvania, and as such, the law of Pennsylvania is controlling.

In Pennsylvania, a decedent's estate may bring an action to recover damages for the decedent's death caused by the wrongful conduct, including negligence, of another. *See* 42 Pa. Cons. Stat. § 8301(a). To prove a medical malpractice claim under Pennsylvania law, a plaintiff must establish four elements: (1) a duty owed to the patient by the physician; (2) the physician's breach of that duty; (3) that the breach was the proximate cause of the patient's injury, or alternatively, a substantial factor in bringing about the patient's injury; and (4) damages suffered by the patient directly resulting from that harm. *See Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa.

9

1990). The duty owed by a physician to a patient is a duty to "[p]ossess and [e]mploy . . . the skill and knowledge usually possessed by physicians in the same or a similar locality" when treating the patient, in addition to exercising "the care and judgment of a reasonable [person]." *Incollingo v. Ewing*, 282 A.2d 206, 213 (Pa. 1971). In a medical malpractice case, the court must first determine the accepted standard of care, and then must determine whether the defendant's conduct adhered to that standard. *See Toogood v. Rogal*, 824 A.2d 1140, 1149 (Pa. 2003). Plaintiff bears the burden of proving by a preponderance of the evidence that the conduct of the physician or health care facility did not meet the applicable standard of care. *See Brannan v. Lankenau Hosp.*, 417 A.2d 196, 199 (Pa. 1980); *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978). To meet this burden, the plaintiff is generally required to present medical expert testimony that the physician's conduct fell below the applicable standard of care and that the physician's breach was the proximate cause of the patient's injury, particularly when the standard is outside of "common knowledge or experience." *See Donaldson v. Maffuci*, 156 A.2d 835, 838 (Pa. 1959) (quoting *Robinson v. Wirts*, 127 A.2d 706, 709 (Pa. 1956)). Where a physician may undertake more than one option in treating a patient, and both options are within the standard of care, it is not negligent for the physician to choose either of such equally appropriate treatment methods. *See Donaldson*, 156 A.2d at 838 (collecting cases).

Plaintiff first argues Dr. Mallory-Whitmore breached her duty of care to Ms. Booker by prescribing her INH without taking a medical or social history and without monitoring her liver function throughout the course of the drug. The Court disagrees. Other than the pill bottle that bears Dr. Mallory-Whitmore's name as the prescribing physician, Plaintiff presented no evidence that Dr. Mallory-Whitmore was involved in Ms. Booker's tuberculosis screening or treatment. *See Hamil*, 392 A.2d at 1284 (placing the burden of proof on the plaintiff in Pennsylvania

medical malpractice claims). In fact, other evidence in the record demonstrates that she was not. As noted, Dr. Mallory-Whitmore credibly testified that she did not see Ms. Booker as a patient outside of an encounter relating to a dental issue, and did not write Ms. Booker a prescription for INH. Further supporting the finding that Dr. Mallory-Whitmore did not write Ms. Booker's prescription is Dr. Ruddock's testimony that she, Dr. Ruddock, in fact, wrote the prescription. While Plaintiff claims the pill bottle bearing Dr. Mallory-Whitmore's name is conclusive evidence that she was the prescribing physician, in light of the testimony of Dr. Mallory-Whitmore and Dr. Ruddock, both of whom the Court credits, the bottle is insufficient to prove Dr. Mallory-Whitmore's involvement in prescribing the drug. Having had no participation in the events surrounding Ms. Booker's tuberculosis screening and treatment, Dr. Mallory-Whitmore likewise can have no liability for her death.

Plaintiff next argues Dr. Ruddock breached her duty of care to Ms. Booker for the same reasons: she prescribed INH without taking a medical or social history and without monitoring Ms. Booker's liver function throughout the course of the drug. Consistent with Pennsylvania law regarding medical malpractice, in order to determine whether Dr. Ruddock breached the duty she owed to Ms. Booker, the Court must first establish the appropriate standard of care. *See Toogood*, 824 A.2d at 1149 (discussing the process for determining whether a physician breached his or her duty of care). To determine the appropriate standard of care, the Court relies upon the expert testimony presented by the parties. *See Robinson*, 127 A.2d at 709 (explaining the necessity of guidance from witnesses having expert qualifications in defining the appropriate standard of care in a particular medical situation). Both medical experts testified at trial that a patient who has a positive PPD followed by a negative chest x-ray has a diagnosis of latent tuberculosis. According to both Dr. Patterson and Dr. Hamilton, the benchmark standard of care

for latent tuberculosis is a nine-month course of INH. The experts also agreed that a patient taking INH who is over 35 years of age should have his or her liver enzymes tested at least monthly to monitor the effect of the drug on the patient's liver. The primary issue here is whether Dr. Ruddock was responsible for undertaking this subsequent monitoring.

While Dr. Patterson agreed with Dr. Hamilton that it is within the standard of care to instruct a patient with latent tuberculosis to see his or her primary care physician for treatment and monitoring, the experts diverged on whether such an instruction is appropriate when the diagnosing physician also writes the prescription for the drug. Dr. Hamilton testified that even if the physician writes an INH prescription, the patient could still be referred to his or her primary care physician to make the ultimate determination on whether the patient should take the medication. In contrast, Dr. Patterson opined that it is the prescribing physician's responsibility to ensure that any testing necessary to monitor the safety and efficacy of the drug is undertaken. However, Dr. Patterson's testimony does not account for the circumstances in which the prescription was given, including the fact that Dr. Ruddock instructed Ms. Booker to discuss the treatment plan with her primary care physician before beginning the drug.

Crediting Dr. Ruddock's testimony, Dr. Ruddock did not intend to assume responsibility for Ms. Booker's treatment for latent tuberculosis when she met with her and wrote the prescription for INH. Rather, Dr. Ruddock intended to, and the Court finds she did, inform Ms. Booker of her results and the recommended treatment plan and, due to the type of medication, instruct Ms. Booker to discuss it with her primary care physician. While there is no documentation to corroborate Dr. Ruddock's recollection regarding the instruction to see her primary care physician, the Court finds Dr. Ruddock's trial testimony on the matter specific and persuasive that the conversation did occur. Ms. Booker and her personal physician were then to

12

decide together, based on the entirety of her health history and current medications, whether she should take the nine-month course of INH. Both experts agreed that the monitoring associated with an INH prescription could be appropriately undertaken by either a patient's primary care physician or a consulting physician. As it was, therefore, equally appropriate for Dr. Ruddock to prescribe INH and monitor Ms. Booker's liver function herself as it was to refer her to her primary care physician, Dr. Ruddock cannot be faulted for choosing the latter of these options. *See Donaldson*, 156 A.2d at 838 (explaining there can be no liability for a physician who chooses one of two appropriate treatment methods). Dr. Ruddock provided the prescription only as a courtesy to Ms. Booker, so she could obtain it conveniently and at a reduced cost at the facility's on-site pharmacy, especially considering the long duration of time over which Ms. Booker may potentially be taking the drug. Dr. Hamilton, contemplating the exact sequence of events as they took place in this case, testified this was an appropriate course of action, within the standard of care.

Plaintiff also argues that Dr. Ruddock breached her duty to Ms. Booker when she prescribed INH without performing a physical examination or taking a medical or social history. This argument fails to appreciate the context of the events at issue here. Dr. Ruddock saw Ms. Booker only for purposes of tuberculosis screening as part of the EHP, and wrote the prescription for INH only for Ms. Booker's convenience. Dr. Ruddock did not intend to assume responsibility for Ms. Booker's treatment for latent tuberculosis. Furthermore, Plaintiff's expert, Dr. Patterson, conceded that a physical examination and medical and social history are recommended based on literature and guidelines, but not necessarily required prior to prescribing medication. It is also undisputed that INH was not contraindicated for Ms. Booker, such that the taking of a health history would likely not have precluded the INH prescription in any event. Plaintiff's further

argument that Dr. Ruddock was overextended in her professional duties is simply irrelevant. At issue here is whether Dr. Ruddock adhered to the standard of care; the number and type of positions she held at the time she saw Ms. Booker through the EHP fails to shed light on the inquiry. Based on the foregoing, the Court finds Plaintiff failed to meet her burden of proving by a preponderance of the evidence that Dr. Ruddock breached the duty of care owed to Ms. Booker. *See Hamil*, 392 A.2d at 1284 (establishing that the plaintiff bears the burden of proof).

Plaintiff's contentions as to GPHA are likewise unpersuasive. Plaintiff argues GPHA should be held liable for her mother's death because GPHA defectively designed its EHP, particularly in that employees testing positive for latent tuberculosis were required to take INH as a condition of employment. The record belies this charge, as Dr. Janet Young, GPHA's Chief Medical Officer/Director, testified at trial that a patient with latent tuberculosis who had no active symptoms was not, in fact, required to take INH in order to remain employed by GPHA. Nor did the EHP require a prescription for INH to be issued to employees diagnosed with latent tuberculosis at all. Given the EHP's limited scope, the extent of care provided pursuant to the EHP was intentionally left to the professional judgment of the EHP physician involved. Once the objective of screening employees for tuberculosis was accomplished, the medical judgment of the physician controlled, and as discussed above, Dr. Ruddock exercised that judgment appropriately and within the standard of care. Plaintiff further argues that GPHA was negligent in the supervision and monitoring of its employees, but offers little support for this contention. Dr. Young testified as to GPHA's supervisory structure and Plaintiff presented no evidence that this structure was flawed or ineffective. Booker's position that GPHA is vicariously liable for her mother's death because its physicians were acting within the scope of their employment when

they breached their professional duties is equally without merit. Because the Court finds no liability with respect to either of the physicians, GPHA is not vicariously liable.

**CONCLUSIONS OF LAW**

For the reasons set forth above, the Court concludes Plaintiff failed to show by a preponderance of the evidence that Dr. Mallory-Whitmore, Dr. Ruddock, or GPHA is responsible for her mother's death. The Court finds Dr. Mallory-Whitmore did not owe a duty of care to Ms. Booker, Dr. Ruddock did not breach her duty of care, and GPHA's EHP was neither defectively designed nor negligently supervised or monitored. Further, as the Court finds neither of the named physicians is responsible for the death of Ms. Booker, GPHA is similarly not vicariously liable for her death.

For the foregoing reasons, judgment will be entered in favor of the Government. An appropriate Judgment follows.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, J.